IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JENNIFER R. LAM-QUANG-VINH,

                     Plaintiff,

v.

SPRINGS WINDOW FASHIONS, LLC,

                     Defendant.

OPINION AND ORDER

20-cv-384-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Jennifer R. Lam-Quang-Vinh alleges that her former employer, defendant Springs Window Fashions, LLC, terminated her employment after she identified and reported what she reasonably believed were defendant's violations of tariff laws. She brought this suit under the False Claims Act, 31 U.S.C. § 3730(h), contending that defendant retaliated against her in violation of the Act.

Defendant has filed three motions that are now before the court. First, defendant filed a motion for summary judgment, contending that it fired plaintiff because of her poor performance and not because of any protected conduct. Dkt. #28. Because plaintiff has not submitted evidence from which a reasonable jury could conclude that defendant retaliated against her because of her protected conduct, defendant's motion will be granted.

Second, defendant filed a motion relating to depositions and the schedule, dkt. #41, which will be denied as moot, now that her motion for summary judgment will be denied. Third, defendant filed a motion seeking sanctions against plaintiff and her counsel on the ground that plaintiff had allegedly disclosed privileged documents to her counsel. Dkt. #23. I agree with defendant that plaintiff should have sought the documents at issue through the discovery

1

process, and should not have removed them from defendant's offices without permission. However, I am not persuaded that the court should sanction either plaintiff or her counsel in this case. Despite defendant's arguments to the contrary, it is likely that plaintiff would have been able obtain these documents through discovery. The documents are relevant to one of the elements of plaintiff's retaliation claim, as they support plaintiff's argument that she engaged in protected conduct by offering an opinion about defendant's tariff obligations that was supported by outside counsel. Defendant has not shown that it suffered unfair prejudice by plaintiff's disclosure of the documents.

## UNDISPUTED FACTS

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed unless otherwise noted.

### A. The Parties

Defendant Springs Window Fashions, LLC manufactures and distributes window coverings. Defendant imports fabrics and materials from suppliers around the world, and has manufacturing facilities in Mexico. In 2019 and 2020, defendant employed more than 5,000 employees worldwide, including approximately 500 at its Middleton, Wisconsin headquarters.

Plaintiff Jennifer R. Lam-Quang-Vinh formerly worked as an import specialist with United States Customs and Border Protection, and has extensive training and experience with international trade, tariffs, customs regulations and inventory management. Defendant hired plaintiff as its senior manager of global trade and customs in January 2019. In that position,

plaintiff was responsible for managing defendant's import and export customs and trade compliance programs.

### B. The Previous Senior Manager of Global Trade and Customs

Before plaintiff was hired, Jennifer Sharkey had been defendant's senior manager of global trade and customs. Like plaintiff, Sharkey was formerly employed as a United States Customs Officer, and had considerable knowledge about global trade and customs compliance.

In spring 2018, Sharkey gave a presentation to defendant's senior leadership about supply chain, trade and duty issues, and how recent changes to trade and customs laws from the Trump administration could affect defendant's budget. Defendant's chief executive officer, Eric Jungbluth, asked several questions about Sharkey's presentation. Cuyler Cunningham, defendant's vice president of procurement, dismissed Sharkey's analysis as a "doomsday scenario." During a subsequent conference call about the financial impact of recent tarriffs on goods originating in China, Jungbluth asked Sharkey why defendant could not just ship goods to Taiwan to avoid the tariffs. Sharkey told Jungbluth that doing so would be illegal.

In spring 2018,Sharkey was asked to prepare a comprehensive financial impact analysis of recent Trump administration tariff orders and a recent United States Customs ruling issued to one of defendant's suppliers, TehYor, related to the classification, origin and NAFTA status of cellular fabric blankets used to make defendant's window shades. Sharkey concluded that certain TehYor fabrics should be designated as originating in China, even though a China designation would require defendant to pay higher tariffs.

In late September 2018, Sharkey learned that new laws were going to have a further

negative impact on defendant's solar roller shade business. Sharkey promptly advised defendant's chief financial officer, Chris Nagel, and apologized for not having seen the change sooner. Sharkey prepared a new financial impact analysis for consideration by defendant's senior management. She also notified management that, in light of NAFTA's treatment of cellular blinds made with TehYor supplied blankets, and a United States Customs ruling issued to TehYor, she believed that the base fabric originated in China, and that defendant needed to change its NAFTA status on certain colors within its cellular blinds product line.

In October 2018, Nagel notified Sharkey that CEO Jungbluth had directed him to issue her a letter of reprimand. In November 2018, Sharkey resigned from her position with defendant.

### C. Plaintiff's Employment with Defendant

#### 1. CAM-FRN inventory discrepancy

In January 2019, plaintiff was hired to fill Sharkey's vacant position. In March 2019, plaintiff learned about a significant inventory discrepancy problem at defendant's Mexican facilities. The various inventory systems used at the facilities were not integrated properly, leading to ongoing discrepancies between import and export inventories. Defendant referred to the problem as the "CAM-FRN" inventory discrepancy problem, and considered it to be a serious problem. If the Mexican government audited defendant and found the problem, defendant could receive fines and penalties and lose trade privileges.

It is likely that the CAM-FRN problem had been occurring for several years when plaintiff learned about it. Chris Nagel, defendant's chief financial officer and plaintiff's direct

supervisor, told plaintiff to oversee the creation of a plan to fix the inventory discrepancy problems. In April 2019, plaintiff projected that under best case scenario, the CAM-FRN problem could be fixed at all three Mexican locations by June 2020. Under the worst case scenario, the problem would not be fixed until December 2020 at one or more locations.

Nagel left the company in May 2019. Before leaving, he told plaintiff that he was satisfied with her job performance and offered to provide her a positive job reference if she needed one in the future.

Between June and September 2019, plaintiff reported directly to Eric Jungbluth, defendant's chief executive officer. Plaintiff prepared a list of strategic initiatives for which she was responsible and provided it to Jungbluth. The first item on the list was the CAM-FRN inventory problem, with a "target completion date" of June 2020. Plaintiff and Jungbluth met privately to discuss her goals and objectives and his ongoing concerns about international trade and tariff-related issues that could affect defendant financially.

2. Plaintiff's opinion on TehYor fabric country-of-origin

In July or August 2019, plaintiff gave a powerpoint presentation in which she stated that the country-of-origin for certain TehYor products was China, and, as a result, defendant's blankets and cellular shades would be subject to an increased tariff. Dkt. #30-5. TehYor had previously communicated to defendant that the country-of-origin of its products was Taiwan and Malaysia, not China, and Jungbluth wanted to keep the country-of-origin as Taiwan and Malaysia. Plaintiff and Jungbluth had several private meetings during which Jungbluth discussed potential costs associated with the Trump tariffs and related trade initiatives affecting defendant.

During the meetings, Jungbluth was frustrated that plaintiff refused to reconsider her conclusion that defendant owed additional tariffs on the TehYor fabrics.  Jungbluth did not express concerns about the CAM-FRN inventory problem or plaintiff's process in correcting the problems at defendant's Mexican facilities.

On August 22, 2019, after receiving an email from TehYor indicating that the country-of-origin for its fabrics was Taiwan or Malaysia, not China, Cuyler Cunningham, defendant's vice president of global procurement, sent the following email to plaintiff and four other executives:

> All,
>
> After reviewing Tariff rulings and sharing with TehYor, below is their feedback and information that would support that . . . we are not required to pay any tariffs for Round 4. With this information, I feel we should also follow up to see if this has any impact or change on the additional USMCA/NAFTA rulings.
>
> Jen [Plaintiff], please look into this information in regard to NAFTA and respond early next week. Results from this analysis will have a direct impact on our plans and timing to insource our cellular OPP products.

Dkt. #30-6.

Despite the positions of TehYor's and the company, plaintiff continued to think that the country-of-origin of the TehYor fabrics was China, which would have required defendant to pay additional tariffs.  She expressed this opinion to Cunningham and John Comerford, defendant's general counsel.  At a September 12, 2019, meeting with Cunningham and Andy Hubred, vice president of finance, plaintiff stated that she was skeptical of TehYor's description of its processing and its designation of country-of-origin.  Plaintiff was told that Jungbluth was vehemently opposed to paying the additional tariffs.  Plaintiff felt berated by Cunningham and Comerford.  At another meeting a few days later, plaintiff again explained her ongoing concerns about defendant's failure to pay import tariffs.  Jungbluth responded angrily that he would not

6

be paying any such tariffs or duties.

At an October 30, 2019 business meeting, Comerford, defendant's general counsel, stated that defendant had made a business decision about the TehYor fabric country-of-origin issue. Plaintiff responded that it was the management team's call to make the decision and that she accepted it. Plaintiff did not have any further discussions with anyone at the company about the issue.

### 3. Reporting to Tom Oliver

Meanwhile, plaintiff had started reporting to a new supervisor—Tom Oliver—toward the end of September 2019. Oliver had joined defendant as chief financial officer in August 2019. Plaintiff told Oliver about her work priorities, including the CAM-FRN inventory discrepancy problem. Oliver did not have any discussions with plaintiff about the TehYor fabric country-of-origin issue, though he was aware that plaintiff had taken a position contrary to Jungbluth on the issue. Oliver had no experience in customs or tariff issues, was not involved in making decisions about country-of-origin, and never criticized plaintiff for her position on the issue. In response to an email, Oliver advised plaintiff to continue importing the fabrics as originating in Malaysia and Taiwan, as the company had decided that this was the correct designation. Oliver also told plaintiff that defendant's counsel was working on confirming the designation of origin with an "outside opinion." Dkt. #36-4.

Oliver wanted plaintiff to focus on the CAM-FRN inventory discrepancy problem. This was his primary concern because he thought the company risked incurring penalties if it were audited by the Mexican government. Oliver knew that plaintiff did not cause the CAM-FRN

7

problem, but he held her responsible to create a plan to fix the problem. Oliver was aware that plaintiff had known about the problem since March 2019. He thought the problem could be fixed in 9 to 12 months, based in part upon a calendar plaintiff had provided to the management team before Oliver joined the company.

At a November 26, 2019, plaintiff and Oliver discussed the CAM-FRN problem. Oliver did not criticize plaintiff or express frustration at her work. But at one point during the meeting, plaintiff mentioned a five-year plan, and Oliver responded that plaintiff would "not be here in five years." Plaintiff did not know what Oliver meant and did not ask him to clarify.

4. Performance improvement plan

In December 2019, defendant's executives wanted to improve the performance of its employees. Each leader, including Oliver, was asked to review their staff and determine whether anyone needed to be placed on a performance improvement plan. No one directed Oliver to issue a performance plan to plaintiff or any employee in particular, and no one suggested that Oliver review plaintiff's performance in particular. Oliver decided to place two of his employees on performance improvement plans: plaintiff and another employee. Oliver thought that plaintiff's communication style was difficult to follow, that she was not concise and that she lacked planning capabilities. He was also frustrated by what he perceived to be her lack of progress on the CAM-FRN problem.

Oliver gave plaintiff the performance improvement plan on December 16, 2019. Dkt. #30-9. This was the first time that Oliver had expressed any frustration or displeasure with plaintiff or her job performance. The performance improvement plan addressed four areas in

which Oliver believed plaintiff was not meeting performance expectations: (1) failure to adequately address the CAM-FRN audit; (2) inadequate support of business objectives; (3) lack of progress on reducing outside support; and (4) inability to communicate concisely. With respect to the CAM-FRN audit, the plan stated:

> The disconnect between the inventory balances reflected in the CAM and FRN systems has been known since an audit was completed 9 months ago. This situation required immediate actions and to date no remedy has been implemented.
>
> In fact, the failure to implement better controls procedures allowed the problem to grow considerably.

According to the plan, plaintiff needed to implement a recovery plan for CAM-FRN disconnect:

> We are out of time. This must be done by 1/6/20. We need a clear plan to address the current disconnect to bring it back in line with what we know to be true. And we need monthly procedures in place that never allow this to happen again.

Plaintiff's performance improvement plan stated that she would be assessed after 30, 60, and 90 days from the date of the plan, and that she would be terminated if her progress was "unacceptable at any of the reviews."

Oliver met with plaintiff for 45 to 60 minutes on December 16, 2019, to explain the performance improvement plan and his expectations. Oliver told plaintiff that she should not worry about being fired because he had "no reason to believe that we can't do this in 90 days" and that defendant liked to give performance improvement plans "to document things."

Plaintiff thought that she was being placed on the performance improvement plan in retaliation for the opinions that she had given regarding the TehYor country-of-origin issue, so she retained an employment attorney. On January 6, 2020, plaintiff's attorney sent Oliver a letter stating that defendant had retaliated against plaintiff in violation of the False Claims Act.

9

Oliver forwarded the letter to defendant's general counsel and Jungbluth. Oliver and Jungbluth thought that plaintiff's accusations were "outrageous" and unfounded.

The same day, January 6, plaintiff submitted to Oliver a plan to address the CAM-FRN issue. The plan had been created by plaintiff's subordinate in Mexico, Cesar Holguin, with plaintiff's input. Oliver reviewed the plan but did not think it was a complete recovery plan with specifics, such as a calendar, time line and budget. The plan also did not suggest that the problem would be resolved in 9 to 12 months.

Plaintiff submitted additional information to Oliver about the CAM-FRN recovery plan by email on January 10 and 24, 2020. Oliver was still unsatisfied, as plaintiff had not provided a specific time line or budget. Oliver asked plaintiff to better describe the entire process including providing an ultimate end date, but plaintiff did not think it was realistic to provide an end date for such a large and ongoing project.

5. Plaintiff's termination

In early February, the Mexican government conducted an audit of one of defendant's Mexican facilities. (The parties dispute when plaintiff first learned about the audit, but the dispute is immaterial for purposes of summary judgment.) Oliver did not learn about the Mexican government's audit until after it started, on February 5, 2020, and did not hear about it directly from plaintiff until February 7, 2020. Oliver was very frustrated that he had not heard about the audit immediately, as an audit was what he had been most concerned about with the CAM-FRN problem. Oliver sent plaintiff an email on February 8, 2020, which stated in part, "To be clear, I knew about this issue on Wednesday late morning/early afternoon and

this was your first communication to me about a very serious matter." Plaintiff responded that, "this was absolutely not the first communication on this matter," pointing out that she had directed Cesar Holguin to tell Oliver about the audit earlier. Plaintiff accused Oliver of retaliating against her.

Oliver terminated plaintiff's employment on February 17, 2019. According to Oliver, he was frustrated that plaintiff had made little progress on the problems identified in her performance improvement plan, especially the CAM-FRN problem. Oliver concluded that he could not rely on plaintiff to fix the problem, and that the company was in a worse position because of the Mexican audit. Oliver also lacked confidence in plaintiff's planning skills, and he thought that she was unfocused, distracted, unreliable and had a poor communication style. Oliver made the final decision to terminate plaintiff, and was not directed to do so by Jungbluth or any other executive.

## OPINION

Plaintiff contends that defendant terminated her employment because she disagreed with defendant's management team and legal counsel about the country-of-origin and tariffs owed on one of its products. She contends that defendant's alleged retaliation violated the False Claims Act's whistleblower provision, which prohibits retaliation against employees who take "lawful acts" done "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). To succeed on a retaliation claim under § 3730(h), a plaintiff must prove that (1) she engaged in protected activity; (2) the employer knew about the activity; and (3) the employer took adverse action against her because

of her protected activity. Halasa v. ITT Educational Servces, Inc., 690 F.3d 844, 847 (7th Cir. 2012); Fanslow v. Chicago Mfg. Ctr., Inc., 384 F.3d 469, 479 (7th Cir. 2004).

Defendant does not dispute, for purposes of summary judgment, that plaintiff can prove the first and second elements of her retaliation claim. In particular, defendant does not dispute that plaintiff's opinion regarding the country-of-origin for TehYor fabrics and the related tariff issues was protected under the False Claims Act. Defendant also does not dispute that it was aware of plaintiff's protected activity. However, defendant contends that plaintiff's retaliation claim fails on the third element because she cannot show that she was terminated because of her protected activity.

At summary judgment, the question for the court is whether plaintiff has submitted enough evidence from which a reasonable jury could find that she suffered an adverse action because of her protected activity. Halasa, 690 F.3d at 848 ("[I]n order to avoid summary judgment [on False Claims Act retaliation claim] [plaintiff] must have evidence that would support a finding that he was fired 'because of' his protected conduct."); Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 764 (7th Cir. 2016) (summarizing summary judgment standard for discrimination and retaliation claims). In this instance, plaintiff points to the following as evidence of retaliation: (1) unfair criticism and hostility from Eric Jungbluth and other executive officers; (2) stray statements by Oliver suggesting that plaintiff would be fired; (3) suspicious timing of defendant's punitive measures taken against her; and (4) defendant's proffered reasons for placing her on a performance improvement plan and firing her are pretextual. I address each in turn.

A. <u>Statements by Defendant's Executive Officers</u>

Plaintiff contends that several of defendant's executive officers, including Jungbluth, Cunningham, Comerford and Hubred, made negative or angry comments in response to her opinions about the TehYor fabric country-of-origin issue. In particular, she says that these executives expressed frustration that she would not change her opinion to align with Jungbluth's opinion regarding paying additional tariffs. However, even accepting plaintiff's statement that she felt berated by these executives, this evidence does not support a finding that plaintiff suffered adverse consequences because she expressed her opinion on the country-of-origin issue.

Plaintiff suggests that the negative comments from Jungbluth and others are sufficient to qualify as retaliatory action by themselves, but this argument fails. Plaintiff's allegations that certain executive officers expressed frustration, or even anger, with her analysis is not enough to sustain a retaliation claim. Plaintiff has not identified any specific comments that were made to her, beyond stating that Jungbluth was "frustrated and visibly irritated," that she felt "angrily berated," and that she was "scolded" for not acquiescing to Jungbluth's view of the tariff question. PPFOF, dkt. #34, ¶¶ 28, 30, 31. These isolated incidents of plaintiff's supervisors expressing frustration with her are not sufficient to support an actionable retaliation claim. <u>Smart v. Ball State University</u>, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action"); <u>Hoosier v. Greenwood Hosp. Mgmt. LLC</u>, 32 F. Supp. 3d 966, 978 (N.D. Ill. 2014) (isolated incidents of "being singled out and spoken to harshly" by supervisor are not sufficient to support discrimination claim).

In addition, plaintiff's reliance on statements by Jungbluth, Cunningham, Comerford and Hubred as evidence of retaliation fails because it is undisputed that none of these executives was

13

involved in the decision to place her on a performance improvement plan or to fire her. Skiba v. Illinois Central Railroad Co., 884 F.3d 708, 722 (7th Cir. 2018) (comments by non-decisionmakers not evidence of discriminatory intent); Lucas v. Chicago Transit Authority, 367 F.3d 714, 730 (7th Cir. 2004) (same). In fact, plaintiff has no evidence showing that any of these executives were consulted regarding the performance improvement plan or termination decision. And plaintiff cannot rely on a "cat's paw," theory of liability because she has presented no evidence that the actual decisionmaker, Tom Oliver, was influenced in any way by Jungbluth, Cunningham, Comerford or Hubred, or by their alleged negative comments about plaintiff's tariff opinions. Schandelmeier-Bartels v. Chicago Park District, 634 F.3d 372, 379 (7th Cir. 2011) (jury may infer "that another employee's impermissible bias infected a decision" only if "plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision"). I conclude, therefore, that comments from defendant's executive officers do not provide support for plaintiff's retaliation claim.

### B. Stray Statements by Oliver

Plaintiff points to two alleged statements that Oliver made regarding plaintiff's employment with defendant that she says are evidence of retaliatory intent. First, plaintiff alleges that during a meeting with Oliver in November 2019, he stated that plaintiff did not need to work on a five-year plan because she would "not be here in five years." Plaintiff says that this statement suggests that Oliver had decided in November 2019 to retaliate against plaintiff.

However, this statement does not show that Oliver intended to retaliate against plaintiff

for her protected conduct. Plaintiff concedes that Oliver had not criticized her, her work or her opinions before this meeting or during it. She admits that she never had discussions with Oliver about the tariff or country-of-origin issue. She also admits that she did not know what Oliver meant by the five-year plan statement, and that she did not ask him to clarify. This vague statement provided without any context is not sufficient to show that Oliver acted with retaliatory intent.

Second, plaintiff says that Oliver told her in February 2020, a few days before she was terminated, that she was not going to be with the company much longer. But this statement also is not evidence that Oliver acted in retaliation for plaintiff's protected conduct. Oliver made this alleged statement after he gave plaintiff the performance improvement plan, after he had expressed frustration with plaintiff's work on the CAM-FRN problem and after he found out about the surprise audit by the Mexican government. Although plaintiff might think that Oliver blamed her unfairly for the company's inventory discrepancy problems at the Mexico facilities, Oliver's statement that she was going to be fired was clearly a reflection of his frustration about the CAM-FRN situation. The statement is not evidence of retaliatory intent related to plaintiff's opinions on tariffs for Chinese goods.

### C. Timing of Plaintiff's Performance Improvement Plan and Termination

Plaintiff next argues that the "suspicious timing" of her performance improvement plan and termination provide evidence of retaliatory motivation. She says that the timing of her performance improvement plan was suspicious because it was abrupt and unexpected and occurred shortly after she expressed her opinion on the country-of-origin issue. However, her

15

evidence does not show anything suspicious about the timing of the performance improvement plan. Oliver gave plaintiff the performance improvement plan after he and other executives were instructed to review their employees to determine whether any employee needed to improve their performance. At the time, Oliver's primary concern for plaintiff was her handling of the CAM-FRN problem. The undisputed evidence shows that Oliver was not involved in resolving the TehYor country-origin-issue, and that the country-of-origin issue had been decided by defendant's general counsel before Oliver gave plaintiff the performance improvement plan.

Plaintiff also has not shown that the timing of her termination was suspicious. She says that she should have been given 90 days to complete her performance improvement plan. But the performance improvement plan did not guarantee plaintiff 90 days to correct the issues in the plan. The plan stated that plaintiff's performance would be reviewed in 30-day intervals, and that plaintiff would be terminated if her performance was unacceptable at any of those reviews. Plaintiff was terminated approximately 60 days after being placed on the performance improvement plan, at which time she should have been aware that termination was a possibility.

Plaintiff also says that the timing of her termination was suspicious because it came after her attorney's letter and her own complaints to Oliver about retaliation. However, the timing is not suspicious in light of what else was happening. Oliver decided to terminate plaintiff a few days after he learned that plaintiff had failed to notify him immediately of an audit by the Mexican government. At that point, Oliver had been frustrated for months by plaintiff's performance on the CAM-FRN problem at the Mexico facilities, and blamed her, unfairly or not, for failing to have a plan in place to fix the problem before an audit occurred. Under the circumstances, there was nothing suspicious about the timing of plaintiff's performance

improvement plan or termination.

### D. Evidence of Pretext

Finally, plaintiff argues that defendant's nonretaliatory reasons for its decision to fire plaintiff—Oliver's perception that plaintiff had ongoing performance problems—are pretextual. To show that defendant's reasons are pretextual, plaintiff "must present evidence suggesting that the employer is dissembling." O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." Id. "[I]t is not 'the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.'" Skiba,884 F.3d at 724 (citations omitted). "To meet this burden, [plaintiff] must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [defendant's] asserted reason[s] 'that a reasonable person could find unworthy of credence.'" Id. (citations omitted).

Plaintiff contends that defendant's proffered justifications for her performance improvement plan and termination are dubious for multiple reasons, but none is persuasive. She argues that she was subjected to the same type of retaliation as her predecessor, Jennifer Sharkey, who expressed a similar opinion about tariff issues. Plaintiff also says that she was a good employee who received a positive performance review from her original supervisor, Chris Nagel. Plaintiff argues that she was blamed unfairly for the CAM-FRN problem, that Oliver had unrealistic expectations as to how soon the CAM-FRN problem could be corrected and that

17

Oliver should have given her more credit for the plan that she and her subordinate provided to him in January 2020. Finally, she says that defendant did nothing to investigate her and her lawyer's allegations of retaliation.

However, none of these arguments suggest that defendant's proffered reasons for placing plaintiff on a performance improvement plan and firing her were false. Plaintiff's evidence regarding her predecessor, Sharkey, is not particularly helpful, as Sharkey had a different supervisor than plaintiff did, was not placed on a performance improvement plan and was not fired. Plaintiff's evidence does not refute defendant's evidence that Oliver thought that plaintiff had performance problems and that she had not made sufficient progress on fixing the CAM-FRN problem. Plaintiff's evidence also does not refute defendant's evidence that Oliver was upset about the audit by the Mexican government and was upset that plaintiff did not notify him about it immediately. In sum, plaintiff has not refuted defendant's evidence that Oliver, the final decisionmaker as to the performance improvement plan and termination, had no retaliatory intent.

Plaintiff's evidence is not sufficient to create a genuine dispute of material fact as to the reasons defendant terminated her employment. Because plaintiff has failed to provide a basis for finding retaliation, defendant is entitled to summary judgment.

ORDER

IT IS ORDERED that

1. Defendant Springs Window Fashions, LLC's motion for summary judgment, dkt. #28, is GRANTED.

2. Defendant's motion for sanctions, dkt. #23, is DENIED.

3. Defendant's motion for a protective order and to amend the scheduling order, Dkt. #41, is DENIED as moot.

4. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 16th day of August, 2021.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge